## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ANTOINETTE MCCARTHY,
Individually, and as the Daughter of
EMERIC J. HARVEY, and JENNIFER
CASTELANO, Individually, and as
the Daughter of EMERIC J. HARVEY,

           Plaintiff,

           v.

THE KINGDOM OF SAUDI ARABIA,

           Defendant.

_____/

CASE NO.:

TRIAL BY JURY DEMANDED

## **COMPLAINT**

Plaintiffs, ANTOINETTE MCCARTHY, Individually, and as the Daughter of EMERIC J HARVEY, and JENNIFER CASTELANO, Individually, and as the Daughter of EMERIC J. HARVEY ("Plaintiffs"), through undersigned counsel, respectfully bring this action against Defendant, THE KINGDOM OF SAUDI ARABIA ("Saudi Arabia"), and allege as follows upon information and belief:

1.  On September 11, 2001, al-Qaeda, co-conspirators, Mohamed Atta, Abdulaziz al-Omari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines Flight 11 bound from Boston to Los Angeles and crashed it into the North Tower or Tower One of the World Trade Center in New York City.

2.  On September 11, 2011, al-Qaeda operatives, Marwan al-Shehhi, Fayez Rashid Ahmed Hassan al-Qadi Banihammad a/k/a "Banihmad Fayez", Ahmed al-Ghamdi, Hamza al-Ghamdi and Mohand al-Shehri hijacked United Airlines Flight 175 bound from Boston to Los

1

Angeles and crashed it into the South Tower or Tower Two of the World Trade Center in the City of New York.

3.      On September 11, 2011, al-Qaeda operatives, Kalid al-Mihdhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi and Majed Moqed hijacked American Airlines Flight 77 bound from Virginia to Los Angeles and crashed it into the Pentagon in Arlington, Virginia.

4.      On September 11, 2001, al-Qaeda operatives Ziad Jarrah, Ahmed al-Hazmawy, Saeed al-Ghamdi and Ahmed al-Nami hijacked United Airlines Flight 93 bound from Newark to San Franciso.   In an act of extreme and honorable courage, the passengers of Flight 93 rose up and in combination overtook the hijackers resulting in the airplane crashing in Shanksville, Pennsylvania prior to reaching its destination in Washington, D.C.

5.      All nineteen (19) hijackers were members of Osama bin Laden's al-Qaeda terrorist group.

6.      Fifteen (15) of the nineteen suicide hijackers were Saudi Arabian nationals.

7.      Al-Qaeda's ability to conduct large scale terrorist attacks was the direct result of the support al-Qaeda received from its material sponsors and supporters, including Saudi Arabia.

8.      Saudi Arabia willingly and knowingly provided material support to al-Qaeda leading up to the September 11 Attacks with knowledge of al-Qaeda's intent to conduct terrorist attacks against the United States including the September 11 Attacks.

9.      Saudi Arabia was aware that al-Qaeda would use the support provided by them to achieve its objective.

10.     Without the support provided by Saudi Arabia, al-Qaeda would not have had possessed the capacity to conceive, plan and execute the September 11 Attacks.

## JURISDICTION

11.     On September 28, 2016, Congress passed the Justice Against Sponsors of Terrorism Act ("JASTA") which provides jurisdiction in any case where money damages are sought against a foreign state where there was a physical injury to person, property or death occurring in the United States and caused by 1) an act of international terrorism in the United States, and 2) a torturous act or acts of the foreign state or of any official employee or agent of that foreign state while acting within the scope of his or her office, employment or agency regardless of where the torturous act or acts of the foreign state occurred.  28 USC Section 1605B(b)**.   ("JASTA" is attached hereto and labeled Exhibit "1".)**

12.     Paragraph 7 of JASTA states that "the United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries".

13.     JASTA stated that in any action when injury arising from an act of international terrorism, liability may be asserted against any person or entity who aids and abets an organization that has been designated as a foreign terrorist organization by knowingly providing substantial assistance or who conspires with the person who committed such an act of international terrorism.

14.     JASTA specifically applies to any civil action "arising out of an injury to a person, property or business on or after September 11, 2001."

15.     Paragraph 2b of JASTA states that "the purpose of this act is to provide civil litigants with the broadest possible basis consistent with the constitution of the United States to

seek relief against persons, entities in foreign countries, wherever active, and wherever they may be found, that <u>may have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States</u>".  (Emphasis added)

16.     Section 4 of JASTA with its headnote of Aiding and Abetting Liability for Civil Actions Regarding Terrorist Acts states in subsection 2 that "in an action under subsection (a) for an injury arising from the act of international terrorism committed, or authorized by an organization that had been designated as a foreign terrorist organization under Section 219 of the Immigration and Nationality Act (8 USC  1189) as of the date on which such an act of international terrorism was committed, or authorized, liability may be asserted as to any person who aids and abets by knowingly provided substantial assistance or who conspires with the person who committed such an act of international terrorism". id et 4(d) 2.

17.     Pursuant to 28 USC 1605B(c) , a national of the United States may bring a claim against a foreign state in accordance with 18 USC Section 2323, the Anti-Terrorism Act ("ATA").

18.     ATA provides that "(a) any national of the United States injured in his or her person, property or business by reason of an act of international terrorists, or his or her estate, survivors or heirs, may sue thereof in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the costs of the suit including attorney's fees".

19.     The amendments by JASTA specifically applies to any civil action arising out of an injury to a person or property or business on or after September 11, 2001.

20.     Venue is proper in this district pursuant to Section 28 USC 1391, because the acts of terrorism occurred at the World Trade Center in Manhattan which is within the jurisdiction of this court.

## EMERIC J. HARVEY – MURDERED AND TORTUROUSLY KILLED ON SEPTEMBER 11, 2001 AS A RESULT OF THE SUPPORT GIVEN DIRECTLY OR INDIRECTLY BY SAUDI ARABIA

21.     Emeric J. Harvey had two daughters namely Plaintiffs, Antoinette and Jennifer at the time of his death.

22.     Emeric J. Harvey conceived and built a company called Harvey Young Yurman, Inc. ("HYY"), a trading company on the New York and American Stock Exchanges.

23.     Emeric J. Harvey can best be characterized by a portion of Antoinette's eulogy, shortly after her father's death.  In that eulogy she said:

> "Harvey Young Yurman for so many of us is a household name.  It represents a family away from home.  My dad started and stuck with the firm since 1974.  He taught the business of Wall Street with the patience and intensity that gave him the reputation of being one of the most generous, hardworking, successful men in the business.  Confirmed by most of you here today, as well as the men we are here to honor, - many successful careers were born in the booths of HYY and will echo through the canyons of Wall Street forever."

24.     Emeric J. Harvey held his weekly breakfast meetings on Tuesday mornings at Windows on the World restaurant, which was on the 106th and 107th floors of One World Trade Center, North Tower.

25.     Emeric J. Harvey and a group from his company were having a breakfast meeting at the Windows on the World on September 11, 2001.

26.     Emeric J. Harvey was savagely murdered on September 11, 2001 when an airplane was intentionally flown into the top floors of the World Trade Center, killing all of the people who were eating at the Windows on the World restaurant.

## PARTIES

27.     Plaintiff, Antoinette McCarthy ("Antoinette") is a citizen of the United States and is the daughter of Emeric J. Harvey, who is deceased, as a result of the terrorist acts on September 11, 2001 and is entitled to recover damages on the causes of action set forth herein.

28.     Plaintiff, Jennifer Castelano ("Jennifer") is a citizen of the United States and is the daughter of Emeric J. Harvey, who is deceased, as a result of the terrorist acts on September 11, 2001 and is entitled to recover damages on the causes of action set forth herein.

29.     Defendant, The Kingdom of Saudi Arabia is a foreign state within the meaning of 28 USC 1603(a).  Saudi Arabia maintains offices in the City of New York, State of New York, located at The Royal Consulate General of Saudi Arabia 860 2nd Avenue, New York, NY 10017.

30.     Defendant, The Kingdom of Saudi Arabia is a foreign state within the meaning of 28 USC 1391(f) and 1603(a).  Saudi Arabia maintains   an embassy in the United States at 601 New Hampshire Avenue, Northwest, Washington, D.C. 20037.

31.     At all material times stated herein, Saudi Arabia, through its officials, officers, agents and employees provided material support and materials to Osama bin Laden ("bin Laden") and al-Qaeda.  The support provided by Saudi Arabia to bin Laden and al-Qaeda assisted in and/or contributed to the preparation and execution of the September 11 Attacks and the torturous killing of Emeric J. Harvey.

## INTRODUCTION

32.     With the September 11 Attacks on the United States, the once abstract and distant threat of terrorism has become a daily fact of life for every American.  The ongoing threat of terrorism has been permanently lodged in the psyche of every civilized person in this country.

This new reality calls for action.  In response of this act of barbarism, Plaintiffs herein respond with the voice of civilization and ask for justice under the rule of law.

33.     It is the tradition of a civilized nation to allow redress for wrongs to appeal for the rule of law and justice.  Law is the foundation of civilization, thus it is fitting that the rule of law respond to an act of savagery.  For it is the rule of law and the voices of freedom, that separates civilization from barbarism and anarchy.  The rule of law is a powerful weapon to be drawn upon in difficult times and to be forged in our defense.  Plaintiffs invoke the rule of law to hold the Kingdom of Saudi Arabia who promoted, financed, sponsored, or otherwise directly or indirectly, materially supported the acts of the barbarism and terror inflicted on September 11, 2001, and the torturous death of Emeric J. Harvey, accountable for their deeds, by taking vigorous legal action against Saudi Arabia and make Saudi Arabia accountable for its actions. The Plaintiffs will force Saudi Arabia as the sponsors of terror of 9/11 into the light and subject them to the rule of law.

34.     This civil action seeks to hold Saudi Arabia for the insidious form of terrorism that which attempts to hide behind the façade of legitimacy.  Saudi Arabia in a veil of legitimacy was the true enablers of terrorism, the financial resources and support networks of Saudi Arabia through its charities, banks, and individual financiers, are what allowed the attacks of September 11, 2001 to occur.

35.     Terrorists like bin Laden and his al-Qaeda network could not have planned, trained or acted on a massive scale without the significant financial power, coordination and backing of Saudi Arabia.  Saudi Arabia is ultimately responsible for the damages caused by the action of their terrorist agents and clients.

7

36.     On September 20, 2001, President George W. Bush addressed the Joint Session of Congress and made clear to the nation that the United States will fight the war on terrorism on all available fronts.   The lines drawn on that day were diplomatic, military, political, <u>legal and financial</u>. (Emphasis Added).

37.     The war on terrorism is extremely personal to the Plaintiffs herein.  The Plaintiffs lost their beloved father, Emeric J. Harvey as a result of the terrorist attacks on the World Trade Center.

38.     The acts of the United States government attempted to unite and strengthen America by providing tools to intercept terrorism.

39.     Congress responded to the call for war by fashioning the Patriot Act of 2001 which strengthened the prior legal rights of individual citizens to pursue justice and punishment against the perpetrators of terrorists.   Uniting and strengthening America by providing appropriate tools required to intercept terrorism was part of the United States' war against terrorism.   The United States Patriot Act Title X, 2001.   The Patriot Act itself was the culmination of decades of precedent setting judicial decisions and statutory enactments that gave individuals enlarged rights to seek redress and compensation for damages from the sponsors of terrorism.   When perceived as a whole, these legislative and judicial actions vastly empower individual victims of terrorism to work within and enforce justice.  As one United States Court recently stated "the only way to imperil the flow of money and discourage the flow of money and financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts".  *Biom v. Quranic Literacy Institute*, et al, 291 S.3d 1000 (7th Circuit 2002)

40.     The claims of United States citizens injured and damaged by the September 11 Attacks against Saudi Arabia, in the past, have been constantly blocked as a result of the alleged sovereign immunity by Saudi Arabia against lawsuits by the surviving families of the September 11, 2001 victims.  Just recently, the United States Congress, over the veto of President Barack Obama, in its second session of 2016, passed by an overwhelming majority, the Justice Against Sponsors of Terrorism Act referred to as JASTA and described hereinbefore enabling the Plaintiffs in this case to bring this action in this Court.  Congress' enactment of JASTA and other terrorist related statutes evidences legislative intent for accountability and provides these plaintiffs who are victims of the September 11 Attacks a forum for that accountability.   In addition to compensation, this legal action can also punish and deter future acts of terrorism.

41.     The actions of certain members of the Saudi Royal Family are related to the September 11 attacks.  Bin Laden was a naturalized Saudi Arabian whose family had close ties to the circles of the monarchy.  Saudi Arabian money has for years been funneled to encourage radical anti-American actions as well as to fund al-Qaeda terrorists.  Saudi Arabian money has financed terror while its citizens have promoted and executed it.  It is no coincidence that immediately following the September 11 Attacks, members of the bin Laden family were whisked away from the United States to Saudi Arabia at a time when commercial aviation was shut down.

42.     Saudi Arabia's cash infusions to Muslim communities in America was intended to spread its perverse extreme view in an effort for it to take hold in the United States of America. "The Saudis are active at every level of the terror chain from financiers, from cadre to foot soldier, from ideologist and cheerleaders" according to a brief on July 10, 2007 to the Defense Policy Board, a group of prominent intellectuals and former senior officials that advise the

Department of Defense on policy.  "Saudi Arabia supports our enemies and attacks our allies"
continued the briefing reportedly prepared by a Rand Corporation analysis.

43.     The group in power in Saudi Arabia prior to September 11, blocked avenues of
change, and promoted a culture of violence.  The culture of violence was the prime enabler of
terrorist attacks including the horrendous 9/11 attacks.

44.     The Washington Post staff writer, Thomas Ricks in an article in the Washington
Post called Briefing Depicted Saudis as Enemies, dated August 6, 2002, Page A01, stated in part:

> "A briefing given last month to a top Pentagon advisory board describes Saudi
> Arabia as an enemy of the United States and recommended that U.S. officials
> given an ultimatum to stop backing terrorism will face seizure of its oil fields and
> its financial assets invested in the United States.
>
> The Saudis are active at every level of the terror chain from planners to financiers,
> from cadre to foot soldier, from ideologist to cheerleader… Saudi Arabia supports
> our enemies and attacks our allies.  A talking point attached to the last of 24
> briefing slides went even further, describing Saudi Arabia as "the kernel of evil,
> the prime mover, the most dangerous opponent in the Middle East."

### SHORT HISTORY OF AL-QAEDA

### A Short History of al-Qaeda

**We have not reached parity with them yet. We have the right to kill
four million Americans-two million of them children-and to exile twice
as many and wound and cripple hundreds of thousands. Furthermore,
it is our right to fight them with chemical and biological weapons.
America is kept at bay by blood alone. ..**

Al-Qaeda spokesman Sulaiman Abu Ghaith, June 12, 2002.

45.     In or around 1989, Osama bin Laden formed al-Qaeda, which means "the Base"
or "the Vanguard" in Arabic, into an international terrorist group with the aim of opposing non-
Islamic governments with violence. Included in bin Laden's edict was a call for the overthrow of

those Islamic states that were considered to be too secular, or too beholden to the West, in the eyes of Osama bin Laden.

46.    Osama bin Laden went to Afghanistan just after the Soviet invasion in 1979. He became a prime financier, recruiter, and military leader of the Mujahideen groups. He advertised all over the Arab world for young Muslims to come fight in Afghanistan against the Soviets and set up recruiting offices all over the world, including in the United States and Europe. These recruiting offices were often run under the auspices of the Saudi charities which were taking donations from wealthy Saudi families and businessmen. These charities operated in the United States, Europe, Asia, Africa, and the Middle East. Charities became an essential part of the support system to Osama bin Laden, providing the financial resources that enabled them to wage their terrorist attacks, including their most hideous of terrorist attacks on the World Trade Center on September 11, 2001 murdering Emeric J. Harvey.

47.    Wahhabism which is a belief by Osama bin Laden and al-Qaeda loathes modernity, capitalism, human rights, religious freedom and an open society, yet those in power live an extravagant, decadent lifestyle as they profess austerity and practice oppression.

48.    The Saudi charitable institutions raised funds in part through a system of Islamic tithing known as zakat. Zakat, as one of the pillars of Islam, calls for faithful Muslims to give a specified percentage on their income to "charities"... Cash funds held in possession for one year require a two and a half percent zakat payment to a charity which manages the donations.

49.    The intended recipients of the zakat were perverted as radical Islamic fundamentalism grew.

50.    The Saudi Arabian charities were used by the government of Saudi Arabia as a conduit to pass monies to al-Qaeda which assisted in the September 11 Attacks.

## OSAMA BIN LADEN-TERRORIST ACTIVITIES AND ITS CONNECTION TO SAUDI ARABIA

51.     The Saudi Arabian charities were administered by government officials of the government of Saudi Arabia with knowledge that the funds in these charities would be used for terrorist acts such as the September 11 Attacks.

52.     Osama bin Laden paid for the transportation of new recruits to Afghanistan with some of his personal fortune, and set up camps there to train them in terrorist activities. The Afghan government donated land and resources, while Osama bin Laden brought in experts from all over the world on guerilla warfare, sabotage, and covert operations. Within a little over a year, he had thousands of volunteers in training in his private military camps.

53.     After the defeat of the Soviets, these religiously radical and militaristic holy warriors spread out over the world to their countries of origin. Steeped in the bloody perversion of Jihad for many years, they were not inclined to let go of the militant life they had grown accustomed to during the war. Many took up the radical Islamic cause in their home countries with the aim of destabilizing and overthrowing the more secular Arab regimes, for not enforcing a "pure" form of Islam.

54.     One thousand of Osama bin Laden's faithfuls returned to Algeria where they began a nine-year civil war. Those returning to Egypt joined the Gamaa Islamiya and the Egyptian Jihad groups determined to overthrow the government of that country. As many as two hundred of these radical fundamentalists settled in New York and New Jersey within the United States; some of these were later implicated in terrorist plots such as the 1993 World Trade Center bombing.

55.    When Pakistan cracked down on its population of al-Qaeda, many of them fled to Asia and joined radical Islamic groups in the Philippines such as the Abu Sayyaf group. Likewise, some returned to Central Asia to continue the fight against the Russians in Tajikistan, or to other areas such as Bosnia and Chechnya where Muslims were embroiled in conflicts. By this time, Osama bin Laden's funding network was in place, and served as a template for the creation and growth of the al-Qaeda network. Osama bin Laden simply tapped into the same network formed through his Mujahedeen connections and incorporated those militant individuals and groups under the umbrella title al-Qaeda.

56.    After being "expelled" from Saudi Arabia in 1991, and allegedly "disowned" by his own family for his extremist actions, Osama bin Laden moved to Khartoum, the capital of Sudan. Here he continued to recruit former fundamentalist warriors into the ranks of al-Qaeda and offer them employment. In addition to seasoned recruits, new volunteers to his radical cause were given military training and sponsorship in special camps set up there. Soon he had set up factories and farms established for the purpose of supplying jobs to those he had recruited.

57.    Osama bin Laden built roads and other infrastructure for the Sudanese government with his construction company, al-Hijrah Construction and Development Ltd. Osama bin Laden's money built the airport at Port Sudan, as well as a highway linking Khartoum to Port Sudan. These projects helped to establish and strengthen Osama bin Laden's relationship with the Sudanese regime. His import-export firm, Wadi al-Aqiq, began doing brisk business. His Taba Investment Company Ltd. flourished while his agriculture company bought up huge plots of land. The Al-Shamal Islamic Bank, in which Osama bin Laden invested $50 million, helped finance all of these thriving companies, as well as the growing al-Qaeda presence within Sudan.

58.    For five years, terrorist training activities fueled by these economic developments continued, while Osama bin Laden lived in Khartoum under the protection of the Sudanese regime. In 1996, the Sudanese government bowed to pressure from the United States and requested that Osama bin Laden leave the country.

59.    Osama bin Laden moved back to Afghanistan as an honored guest of the Taliban. For the next five years, with the aiding and abetting of the Defendant herein, he continued to fund the terrorist training camps that filled the ranks of al-Qaeda and served as bases from which to plan new attacks against America and the West.

## AL-QAEDA TERRORIST ACTIVITIES

60.    Soon after 1989, al-Qaeda members began international terrorist attacks. The first such attack was against the United Nations forces in Somalia on October 3 and 4 of 1993, in which 18 American servicemen were killed. These terrorists used the military techniques learned in training camps of al-Qaeda. Osama bin Laden and al-Qaeda also plotted the first terrorist attacks against the World Trade Center in 1993, and a plan in 1995 (code named Project Bojinka) to blow up twelve American airliners simultaneously. The backup plan for Project Bojinka was to hijack planes and use them as missiles against prominent American landmarks such as the World Trade Center, the White House, and the CIA headquarters in Langley, Virginia.

61.    Al-Qaeda was also involved in the Khobar towers bombing in Riyadh, Saudi Arabia in which five American servicemen were killed in November 1995. After this attack inside Osama bin Laden's native Saudi Arabia, a group of prominent Saudi's met in Paris where they conspired to pay off Osama bin Laden and his al-Qaeda group to ensure that al-Qaeda would never attack within the borders of the Saudi Kingdom again. This protection

money served to safeguard Saudi Arabia, but also to enlarge the power of Osama bin Laden and al-Qaeda. This plot served to embolden the terrorist leader and his ambition.

62.    In 1998, Osama bin Laden and al-Qaeda orchestrated an attack on the United States embassies in the East African countries of Kenya and Tanzania. These explosions resulted in two-hundred ninety-one deaths and over five-thousand injuries.

63.    The attack on the U.S.S. Cole in Yemen in October of 2000 then followed, with the brutal attacks on September 11th, 2001 thereafter. Osama bin Laden has publicly and proudly proclaimed direct responsibility for these multiple atrocities.

64.    These direct attacks on Americans intensified in 1998 after bin Laden issued this "fatwah," stating:

> We -- with God's help -- call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it. We also call on Muslim ulema, leaders, youths, and soldiers to launch the raid on Satan's U.S. troops and the devil's supporters allying with them, and to displace those who are behind them so that they may learn a lesson.

65.    These words provide a telling insight into how Osama bin Laden treats the world. Having not left the intellectual era of the crusades, in this world view the Middle East is the holy ground on which a battle of the three major religions should be waged.

66.    According to Islamic fundamentalist vision, a Judeo-Christian alliance has evolved which aims to conquer the holy places of Mecca, Medina, and Jerusalem. In this distortion of reality, this alliance is for the violence surrounding Muslims throughout history and the modern world. In line with this world view, Osama bin Laden attempts to use terror to show his fellow Muslims that the "enemies" or infidels of Islam can be eliminated.

67.    Terrorism is closely related to genocide, differing only in scope. The same legal rationale for holding those responsible for facilitating genocide in role of industrialists and

bankers in Nazi Germany applies to financiers and perpetrators of international terrorism responsible for September 11th, 2001.

## THE ROLE OF WAHABBHISM IN THE SEPTEMBER 11 ATTACKS

68.     The vehemence felt by Osama bin Laden, al-Qaeda and its operatives comes from a perversion of Saudi Arabia's sect of Islam, known as Wahabbism.

69.     Wahabbism is a fundamentalist Islamic sect founded by Muhammad ibn Abd al-Wahhab in the 18th century.

70.     Muhammad ibn Abd al-Wahhab sought to rid Islam of the corruptions that he believed had crept into the religion from both within and without the Muslim world. His doctrine reverted to a strictly literal interpretation of the Koran which strove to directly implement the violence surrounding Muslims throughout history and the modern world.

71.     In line with this world view, Osama bin Laden attempted to use terror to show his fellow Muslims that the "enemies" or infidels of Islam can be eliminated. Toward this end, Osama bin Laden has proclaimed his intention to obtain biological, chemical, and nuclear weapons to wage war.

72.     Terrorism is closely related to genocide, differing only in scope. The same legal rationale for holding those responsible for facilitating genocide in role of industrialists and bankers in Nazi Germany applies to financiers and perpetrators of international terrorism responsible for September 11th, 2001.

73.     Today's vehemence comes from a perversion of Saudi Arabia's sect of Islam, known as Wahabbism.  Wahabbism is a fundamentalist Islamic sect founded by Mohammad Ibn Abdul al-Wahhab in the 18th century. Abdul-al-Wahhab sought to rid Islam of the corruptions that he believed had crept into the religion from both within and without the Muslim world. His doctrine reverted to a strictly literal interpretation of the Koran which strove to directly

16

implement the commands of the prophet Mohammed. Therefore, Wahhabism, in Abdul al-Wahhab's view, became the sole source of legitimate Islamic thought and action. (However, Abdul al-Wahhab was not a direct descendent of the prophet Mohammad, raising serious questions about its legitimacy.)

74.     Al-Qaeda and its radical fringe refuse to move beyond ancient ideologies.

75.     The al-Wahhab rebellions of the nineteenth and twentieth centuries establishing the power of the sect in Arabia were defined by their violence and brutality. As the sect took power, the al-Saud family united with the al-Wahhab movement, eventually making it the "official" form of Islam practiced in Saudi Arabia.

76.     In recent decades, certain sects of Wahhabism have become even more virulent toward Western civilization, extolling the virtues of martyrdom for the sake of saving Islam. For example, inflammatory Khutbahs (sermons) given by the Khateeb (cleric) Salah Al Budair in the Mosques of Mecca and Medina in August 2001 warn of the imminent threat the West poses to Islamic civilization:

> Fellow Muslims! We are nowadays confronted with a relentless war waged by the materialistic western civilization and culture that burns its producers and afflicts them with calamities, misery, immorality, disruption, suicide, and all kinds of evils...it is a civilization that races towards creating all means of trouble, disturbance, and destruction.

77.     Salah Al Budair also emphasizes the greatness of offering to die as a martyr:

> Today we Muslims and indeed the entire world can witness the greatness of martyrdom being illustrated in the uprising in Palestine in general and the Al-Aqsaa in particular. This kind of stance, which revives the magnitude and virtues of martyrdom in the heart of the Muslim nation, is exactly what we need at this time. It is vital that the Muslims exert every effort to spread the love for achieving martyrdom just like the pious early generations of Muslims did. We must continue on the same road that they were on, which is that of our Prophet, and indeed all the prophets before him, in order to support our religion and defeat our enemies.

Revive the importance of martyrdom and reawaken the spirit of seeking it! Instill the virtues of it in the hearts and minds by all methods possible. Our country [Saudi Arabia] has set an example in supporting this and donating generously in its cause from all different sections of the community.. .

78.    Al-Budair finishes up these sermons by justifying the suicide bombings:

The Jews are described in the Book of Allah as those who distort words and facts and quote them out of context and this is what they and their supporters from the tyrant regimes all over the world are currently doing. They use false terminology to misguide, confuse, and deceive. What your brothers are committing in Al-Aqsaa are not acts of mindless violence, but rather it is a blessed uprising to resist and curtail the Jewish oppression and aggression: this is a legal right which all religions, ideologies and international laws recognize. Nobody could deny this fact except the ignorant, arrogant, or evildoers.

79.    Such are the perverse Wahabbi sermons preached to inspire young men to join forces with Osama bin Laden and al-Qaeda in their war against the West. As the former head of counter-terrorism for the FBI and head of security for the World Trade Center at the time of the attacks, John O'Neill, said: "All the answers, everything needed to dismantle Osama bin Laden's organization can be found in Saudi Arabia".

80.    The hate-filled ideology of Al-Budair confirms O'Neill's judgement that the ideological and financial essence of al-Qaeda, that led to the September 11, 2001 terrorist attacks, stems from Saudi Arabia.

## AL-QAEDA'S OBJECTIVES AND TACTICS AS RELATED TO THE SEPTEMBER 11 ATTACKS

81.    In establishing al-Qaeda in 1988, bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and to engage in armed combat wherever Muslim communities were perceived to be under duress, in furtherance of the ultimate objective of establishing a Pan-Islamic Caliphate.

82.    Al-Qaeda employs a range of operational tactics and initiatives in the pursuit of its goals, which complement one another as part of a carefully conceived and coordinated global

strategy.

83.     In describing the importance of these regional military campaigns within the overall context of al-Qaeda's jihad against the West, a 1998 Department of Defense Intelligence Report states as follows:

> [al-Qaeda] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as Judeo-Christian and Confucian domination.
>
> The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic (predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

84.     In addition to the value of its participation in regional military conflicts yields in relation to its long-term strategic objectives, al-Qaeda has derived significant immediate benefits from its participation in these regional jihad campaigns.

85.     Al-Qaeda's military operations bolster the organization's image among local Muslims, thereby facilitating al-Qaeda's ongoing recruiting and fundraising efforts. These campaigns also afford the organization an efficient vehicle to provide new members with battle experience, in preparation for terrorist operations and the ongoing military conflict with the United States. In addition, al-Qaeda's financial and operational support for local Islamist and separatist movements has allowed al-Qaeda to co-opt local conflicts and organizations to its own ends. As a result, many pre-existing extremist organizations evolved into al-Qaeda proxies, thereby extending al-Qaeda's operational capabilities, resources, and sphere of influence.

86.     Al-Qaeda's participation in such regional conflicts and jihad campaigns fueled al-Qaeda's growth and development in the years leading up to the September 11`ʰ Attacks. Indeed, according to the 9/11 Commission, al-Qaeda's operational involvement in regional conflicts between 1988 and 1998 served to establish the organization as the vanguard of the global jihadist movement, and directly enhanced al-Qaeda's operational capacity to carry out large scale terrorist attacks:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the al-Qaeda) organization for nearly ten (10) years. He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

9/11 Report at p. 55.

87.     The findings of the 9/11 Commission further confirm that al-Qaeda relied heavily on its global infrastructure in coordinating and staging the September 11ᵗʰ Attacks, and that al-Qaeda could not have successfully mounted those Attacks absent the impressive resources and assets amassed by the organization over the thirteen years preceding the Attacks.

88.     In this regard, the 9/11 Commission found that the "9/11 attack was a complex international operation, the product of years of plotting." The 9/11 Report confirms that plans for the Attacks were carefully vetted through al-Qaeda's most senior leadership over a period of nearly six years, while those leaders were safely ensconced in training camps and safe houses funded by al-Qaeda's financial supporters; that the individuals selected to participate in the Attacks were chosen from an enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated with funds provided by the organization's supporters; and that details of the plans were revised up until the last minute, through a global communication network, the existence of which was also dependent on the financial sponsorship of al-Qaeda's supporters.

89.     Based on the findings of its investigation concerning the relationship between al-Qaeda's global infrastructure and the organization's operational capability to plan, coordinate and mount those Attacks, the 9/11 Commission reached the following conclusion regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack appears to require
>
> A command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
>
> A logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;
>
> Access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;
>
> Reliable communications between coordinators and operatives; and
>
> Opportunity to test the workability of the plan.

90.     Consistent with the findings of the 9/11 Commission, U.S. counter-terrorism officials have repeatedly affirmed the critical importance of al-Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th Attacks, as reflected by the following statements:

> There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it. They note that terrorist attacks themselves cost very little money to carry out — the trivial cost of a suicide belt or similar device — and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.

> The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al-Qaeda, which threaten our national security, is expensive — even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al-Qaeda must spend money for many purposes — to recruit, train, plan operations, and bribe corrupt officials for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Testimony of Stuart A. Levey, Undersecretary of Terrorism and Financial Intelligence, August 23, 2004.

> As this Committee knows well, tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the World from terrorist attacks.... While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations. In recent months, we have seen at least one instance of what we look for most — a terrorist organization indicating that it could not pursue sophisticated attacks because it lacks adequate funding.

Testimony of Stuart Levey, Undersecretary of Terrorism and Financial Intelligence before the House Financial Services Subcommittee on Oversight and Investigations, July 11, 2006.

> (T)errorist organizations require significant funding. Although individual terrorist attack may be inexpensive, terrorist organizations require far more than explosives to sustain themselves. They need money to train, recruit, pay operatives and their families, travel, bribe officials, procure cover and false documents, as well as purchase arms. If implemented effectively, targeted financial sanctions can put terrorist organizations in a financial box, effectively depriving them of the resources they need to conduct this range of activity.

Prepared remarks of Daniel L. Glaser, Acting Assistant Secretary for Terrorist Financing and Financial Crimes before the Meetings Program of Seminars: The Importance of Expanding Targeted Financial Transactions Programs Around the Globe: Challenges and Opportunities, September 23, 2005.

> The primary reason why combating the financing of terrorism efforts are both necessary and important is that terrorist groups need money. Although mounting an individual terrorist attack is relatively inexpensive, the cost to maintain the infrastructure to support terrorist activities is high. Terrorist networks need cash to train, equip and pay operatives, to secure materials and to promote

> their cause. To eliminate or reduce the cell's means of raising and transferring funds is to significantly degrade that cell's capabilities.

*(The Money Trail: Finding, Following and Freezing Terrorist Finances),* Michael Jacobsen and Matthew Levitt (Deputy Assistant Secretary for Intelligence and Analysis of the Treasury Department from 2005 — 2007), November 2008, at p. 3.

> Although a terrorist attack is relatively inexpensive, the cost to maintain a terrorist infrastructure is high. Terrorist networks need cash to train, equip and pay operatives and their families and to promote their causes. Recruiting, training, traveling, bribing corrupt officials and other such activities also cost money. Limiting their ability to raise funds therefore limits their ability to function.

*Follow the Money — The Obama Administration Should Continue to Track How Terrorists get Their Money,* Michael J. Jacobsen and Matthew Levitt, December 23, 2008

91.     Given the financial needs of terrorist organizations, as documented above, Congress has concluded that money is the lifeblood of terrorism, and that any contribution to a terrorist organization furthers acts of terrorism.

## THE DECLASSIFIED 28 PAGES

92.     The 28 pages that were deemed classified by the United States Government from the 9/11 Commission Report (the "911 Report") have now been de-classified.  **(The 28 Pages of the 911 Report are attached hereto as Exhibit "2".)**

93.     According to various documents and one CIA memorandum, some of the 9/11 hijackers while in the United States, apparently had contacts with individuals who may be connected to the Saudi Arabian government.

94.     While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government.  There is information, primarily from FBI sources, that at least two of these individuals were alleged by some to be Saudi intelligence officers.

95.     The joint inquiry also found other indications that individuals connected to the Saudi government have ties to terrorists' networks.  The Committees are primarily concerned about the serious nature of allegations contained in a CIA memorandum found within the files of the FBI's San Diego field office.  That memorandum which discusses alleged financial connections between the 9/11 hijackers, Saudi government officials and members of the Saudi Royal Family, was drafted by a CIA officer [redacted] relying primarily on information from FBI files.

96.     The 911 Report further states "traditionally throughout the Muslim world there is no formal oversight mechanism for donations.  As Saudi wealth increased, the amounts contributed by individuals in the state grew dramatically.  Substantial sums went to finance Islamic charities of every kind".

97.     While Saudi Arabian charities are regulated by the Ministry of Labor and Social Welfare, charities and international relief agencies such as the World Assembly of Muslim Youth (WAMY) are currently regulated by the Ministry of Islamic Affairs.  This ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world, including mosques and schools.  Often these schools provide the only education available.  Even in affluent countries, Saudi Arabian Wahhabi schools are often the only Islamic schools.  Some Wahhabi funding organizations have been exploited by extremists to further their goals of violent jihad against non-Muslims.

98.     For reasons unknown, the government of the United States decided to classify 28 pages of the 911 Report.  Accordingly, the people of the United States were not permitted to see these 28 pages until very recently.  The CBS television program 60 Minutes ran a segment about

these 28 pages and the mystery of why these 28 pages were not available to the public.  With the public outcry about these so-called classified 28 pages, they were unclassified recently.

99.     The aforesaid 28 pages still contains some redactions and blackouts but for the most part, these 28 pages clearly show that the Saudi Arabian government was complicit in the September 11 Attacks.  The aforesaid representatives of the Saudi Arabian government were not only complicit but they also aided and abetted the hijackers involved in the September 11 Attack.

### RELEVANT SECTIONS OF THE 28 PAGES OF THE 911 COMMISSION REPORT RECENTLY DECLASSIFIED

100.    The missing 28 pages state in part:

"Omar al-Bayoumi.  The FBI has received numerous reports from individuals in the Muslim community, dating back to 1999, alleging that al Bayoumi may be a Saudi Intelligence Officer.   FBI files suggest that al Bayoumi provided substantial assistance to hijackers Khalid al-Mihdhar and Nawaf al-Hazmi after they arrived in San Diego in February 2000.  Al-Bayoumi met the hijackers at a public place shortly after his meeting with an individual at the Saudi consulate and there are indications in the files that his encounter with the hijackers may not have been accidental.  During this same timeframe, al-Bayoumi had extensive contact with Saudi Government establishments in the United States and received financial support from a Saudi company affiliated with the Saudi Ministry of Defense. According to FBI file [redacted] at the company said that al-Bayoumi received a monthly salary even though he had been there on only one occasion. This support increased substantially in April 2000, and stayed at that same level until August 2001.  That company reportedly had ties to Usama Bin Ladin and al-Qa'ida.  In addition, the FBI determined that al-Bayoumi was in contact with several individuals under FBI investigation and with the Holy Land Foundation, which has been under investigation as a fundraising front for Hamas.

Osama Bassnan.  Bassnan may have been in contract with al-Mihdhar and al-Hazmi during their time in San Diego.  Bassnan was a close associate of al-Bayoumi and Omar Bakarbashat, another one of the hijackers' close associates. He also lived across the street from the hijackers, and made a comment to an FBi asset that he did more than al-Bayoumi did for the hijackers. According to an FBI document, Basnan told another individual that he met al-Hazmi through al-Bayoumi and later that he met two of the hijackers through al-Bayoumi.  He also told the asset that al-Bayoumi was arrested because he knew al-Hazmi and al-Mihdhar very well.  The document goes on to state that Bassnan and al-Bayouni have been "close to each other for a long time".  Bassnan has may ties to the Saudi Government, including past employment by the Saudi Arabian Education

Mission, referred to in FBI documents as [redacted].  The FBR also received reports from individuals in the Muslim community alleging that Bassnan might be a Saudi intelligence officer.  According to a CIA memo, Bassnan reportedly received funding and possibly a fake passport from Saudi Government officials.  He and his wife have received financial support from the Saudi Ambassador to the United States and his wife.  A CIA report also indicated that Bassnan traveled to Houston in 2002 and met with an individual who was [redacted].  The report states that during that tripe a member of the Saudi Royal Family provided Bassnan with a significant amount of cash.  FBI information indicates that Bassnan is an extremist and supporter of Usama Bin Ladin, and has been connected to the Eritrean Islamic Jihad and the Blind Shaykh.

Shaykh-al Thumalry.  According to FBI documents and a CIA memorandum, al-Hazmi and al-Mihdhar may have been in contact with Shaykh al-Thumalry, an accredited diplomat that the Saudi Consulate in Los Angeles and one of the "imams" at the King Fahad mosque in Culver City, California.  Also according to FBI documents, the mosque was built in 1998 from funding provided by Saudi Arabia's own Prince Abdulaziz.  The mosque is reportedly attended by members of the Saudi Consulate in Los Angeles and is widely recognized for its anti-Western views.

Saleh al-Hussayen.  In September 2001, Saleh al-Hussayen, reportedly a Saudi Interior Ministry official, stayed at the same hotel in Herndon, Virginia where al-Hazmi was staying.  While al-Hussayen claimed after September 11 not to know the hijackers, FBI agents believed he was being deceptive.  He was able to depart the United States despite FBI efforts to locate and re-interview him; and

AbdullahBin Ladin.  Abdullah Bin Ladin claims to work for the Saudi Embassy in Washington, D.C. as an administrative officer.  He is identified by the FBI as Usama Bin Ladin's half-brother.  He is a close friend of Mohammed Quadir-Harunani, a possible associate of Mohamed Atta and Marwan al-Shehhi prior to September 11, 2001."

101.    The joint inquiry also found other indications that the individuals connected to the

Saudi government have ties to terrorists networks including:

"According to an FBI agent in Phoenix, the FBI suspects Mohammed al-Qudhaeein of being [redacted].  Al-Qudhaeein was involved in a 1999 incident aboard an America West flight, which the FBI's Phoenix office now suspects may have been a "dry run" to test airline security.  During the flight, al-Qudhaeein and his associate asked the flight attendants a variety of suspicious questions; al-Qudhaeein then attempted to enter the cockpit on two occasions.  Al-Qudhaeein and his associate were flying to Washington, D.C. to attend a party at the Saudi Embassy, and both claimed that there tickets were paid by the Saudi Embassy.  During the course of its investigations, the FBI has discovered that both al-

26

Qudhaeein and the other individual involved in this incident had connections to terrorism."

102.    Finally, the Committees are particularly concerned about the serious nature of allegations contained in a CIA memorandum found by the Joint Inquiry Staff in the files of the FBI's San Diego Field Office.   That memorandum, which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family, was drafted by a CIA officer [redacted], relying primarily on information from FBI files.  The CIA officer sent it to the CTC to determine whether CIA had additional information.   He also provided a copy to the FBI agent responsible for the investigation of one of the individuals discussed in the memorandum.  Despite the clear national implications of the CIA memorandum, the FBI agent included the memorandum in an individual case file and did not forward it to FBI Headquarters.  FBI Headquarters, therefore, was unaware [redacted] of statements in the memorandum until the Joint Inquiry brought the memorandum's implications to the Bureau's attention [redacted]."

103.    The second individual who may have been in contact with Al-Hazmi also has ties to the Saudi government including connections to the Saudi Ambassador to the United States. There is reporting in FBI files alleging that both of these individuals may be Saudi Intelligence Officers.

104.    During the post September 2011 investigation, the FBI found that:

**Page 426**

- "Al-Bayoumi had been an accountant at the Saudi Civil Aviation Administration from 1976 to 1993, when he relocated to the United States;

- According to the FBI, al-Bayoumi was in frequent contact with the Emir at the Saudi Ministry of Defense, responsible for air traffic control;

- The FBI has also located records, indicating that al-Bayoumi received $20,000 from the Saudi Ministry of Finance at one point;

- When al-Bayoumi applied to schools in the United States in 1998, he had a letter from the Saudi Embassy, which stated that he was getting a full scholarship from the Government of Saudi Arabia; and

- While is San Diego, al-Bayoumi was receiving money from the Saudi Ministry of Defense through a Saudi company called "Ercan".  [redacted] of that company informed the FBI after September 11, 2001 that, although al-Bayoumi only showed up at the company on one occasion, he received a monthly salary and allowances. [redacted] stated that, at first, he attempted to refuse to pay al-Bayouni a monthly salary, but he was told that his company would lose their contract if he did not pay him.  [redacted] informed the FBI that at the time, he attributed this to Saudi corruption."

-

**Page 427**

"Bassman also has other ties to the Saudi Government.  Bassnan's wife received a monthly stipend from Princess Haifa.  In a recent search of Bassnan's residence, the FBI located copies of 31 cashier's checks totaling $74,000, during the period of February 22, 1999 to May 30, 2002.  These checks were payable to Bassnan's wife and were drawn on the Riggs Bank account of Prince Bandar's wife.  The FBI has determined that there has been a standing order on Princess Haifa's account since January 1999 to send $2000 a month to Bassnan's wife.  Bassnan's wife was allegedly receiving the funding for "nursing services," but, according to the [redacted] document, there is no evidence that Bassnan's wife provided nursing services." [redacted].

On at least one occasion, Bassnan received a check directly from Prince Randar's account.  According to the FBI, on May 14, 1998, Bassnan cashed a check from Bandar in the amount of $15,000.  Bassnan's wife also received at least one check directly from Bandar.  She also received one additional check from Bandar's wife, which she cashed on January 8, 1998, for $10,000.

**Page 431**

FBI documents also indicate that several Saudi Naal officers were in contact with the September 11 hijackers.  FBI documents state that the San Diego Field Office opened a counterterrorism investigation on an individual named Osama Nooh, a Saudi naval officer, due to his association with Nawaf al-Huzmi and Khalid al-Mihdher.  In addition, Lafi al-Harbi, another Saudi Naval officer, was in telephonic contact with flight 77 hijackers Khalid al-Mihdhar and Nawaf al-Hazmi on nine occasions from March 11, 2000 to March 27, 2000.

The Jacksonville FBI Field Office is conducting an investigation to determine whether Saleh Ahmed Bedajwi, a Saudi Naval officer within its territory was in contact with Salah Bedaiwi. [redacted]

**Page 433**

Also of potential interest, at least in retrospect, is the 1999 incident involving Mohammed al-Qudhaeein and Hamdan al-Shalawi. Al-Qudhaeein and al-Shalawi were flying from Phoenix to Washington, DC to attend a party at the Saudi Embassy. After they boarded the plane in Phoenix, they began asking the flight attendants technical questions about the flight that the flight attendants found suspicious. When the plane was in flight, al-Qudheeein asked where the bathroom was; one of the flight attendants pointed him to the back of the plane. Nevertheless, al-Qudhaceia went to the front of the plane and attempted on two occasions to enter the cockpit. The plane made an emergency landing and the FBI investigated the incident, but decided not to pursue a prosecution. At the time, al-Qudhaecein and al-Shalawi claimed that the Saudi Embassy paid for their airplane tickets.

**Page 434**

There are other indications in FBI files that elements of the Saudi Government may have provided support to terrorist networks. For example, the FBI had identified the Ibu Tamiyah Mosque in Culver City as a site of extremist-related activity both before and after September 11. Several subjects of San Diego investigation prior to September 11 had close connections to the mosque. Based on interviews and review of FBI files, San Diego FBI agents believed at the time that these subjects were laundering money through this mosque first to Somali non-profit organizations and then to other entities affiliated with Usama Bin Ladin.

**Page 435**

According to the former FBI agent in San Diego who was involved in this investigation, this scheme may allow the Saudi Government to provide al-Qa'ida with funding through covert or indirect means. In his October 9, 2002 testimony the former agent commented on the possible money laundering:

> My guess it is connected somehow with the Saudis. And knowing that probably 70-80 percent of the population of Saudi Arabia support Usama Bin Ladin, it might be an indication.

There are also indications of Saudi governmental support for terrorist activity through charitable organizations. The Saudi-based Umm al-Qura Islamic Charitable Foundation (UQ) is an Islamic non-governmental organization linked to terrorist support activities. According to a May 2002 Defense Intelligence Terrorism Summary, the UQ's activities in support of terrorism include: suspicious money transfers, document forgery, providing jobs to wanted terrorist suspects, and financing travel for youths to attend jihad

training.  The Defense communication notes that since September 2001, UQ couriers have transported over $330,000 in cash, most of which they received from Saudi Embassies in the Far East.  In January 2002, UQ administrator Yassir El-Sayid Mohammed traveled to Thailand to pick up approximately $200,000 from the Saudi Embassy in Bangkok.  In early November 2001, the personal assistant to the UQ administrator traveled to Kuala Lumpur for a meeting at the Saudi Arabian Embassy.  He returned with tens of thousands of dollars, according to the Department of Defense.

CIA, Treasury, and FBI officials have all expressed their concern about the al-Haramain Foundation's ties to both the Saudi Government and terrorist activity.  According to the FBI's [redacted].

**Page 436**

The Treasury General Counsel testified about his agency's concern about the foundation:

MR. AUFHAUSER:  Second, and this is an important point, it also rises out of Rick's testimony, on al-Haramain, the two branch offices that we took a public and joint action against, al-Haramain really does represent a significant issue for the PCC and for terrorist financing and for the United States policy.  It is, of course, the largest, I think the larger Islamic charity in the world.  Its name is synonymous with charity in the Islamic world.  Its direct overseers are members of the Royal Family; significant contributors are members of the Royal Family.  We don't have a great deal of intelligence on the headquarters, about whether they are knowingly assisting people in al-Au'ida and others; but in significant branch offices yet to be designated and under current investigation, we have ample evidence that large cash amounts are being couriered to those branch offices, that large wire transfers of money are being sent to those offices, that a great deal of the money is being dissipated through misspending, unaccounted for, and finally, that those offices have significant contacts with extremists, Islamic extremists.
Page 437

The FBI has developed information that [redacted] has close ties with one of the Saudi princes and accompanies him on many trips, including travel to the United States.  According to the FBI, [redacted] was recently interrogated at the detention facility at Guantanamo Bay.  He has informed the FBI that [redacted] did not earn much money in this job, but that he "had another source of income through a "Saudi prince" named Khalid al-Bandar.  According to [redacted] performed miscellaneous tasks for the Prince, such as handling real estate matters and assisting the Prince's grandmother.  [Redacted] traveled many places with the Prince, including Europe, and often to the United Arab Emirates.  [Redacted] made the cryptic comment that nobody "knew everything about [redacted]".  Although his name was on the State Department's watch list, [redacted] was apparently able to circumvent the Customs Service and the Immigration and Naturalization Service because he was traveling with the Saudi prince.  The FBI

only learned of the trip after the fact.  Agents in the FBI's Portland Field Office expressed their concern that [redacted] and others were using their status as Saudi Arabian Airlines employees as a cover to enable them to transport weapons in and out of the United States.

**Page 438**

According to the former Chief of Alec Station, the unit in the DCI's Counterterrorist Center established in 1996 to focus specifically on Usama Bin Ladin, it was clear from about 1996 that the Saudi Government would not cooperate with the United States on matters relating to Usama Bin Ladin.  There is a May 1996 memo from the DCI's Counterterrorist Center [redacted] stating that the Saudis had stopped providing background information or other assistance on Bin Ladin because Bin Ladin had "too much information about official Saudi dealings with Islamic extremists in the 1980s for Riyadh to deliver him into U.S. hands."  In a June 1997 memo to the DCI, Alec Station reemphasized the lack of Saudi cooperation and stated that there was little prospect of future cooperation regarding Bin Ladin.  The former Chief of Alec Station through that the U.S. Government's hope of eventually obtaining Saudi cooperation was unrealistic because Saudi assistance to the U.S. Government on this matter was contrary to Saudi national interests.

**Page 440**

Both the FBI and CIA have informed the Committees that they are treating the Saudi issue seriously.  According to the November 18, 2002 FBI response, the FBI and CIA have established a working group to look into the Saudi issue.  The FBI formed a squad at the Washington Field Office [redacted] to investigate this issue and [redacted].

105.    On December 22, 2013, the Whiteout Press published an article by Mark Wachtler headlined with "CIA Leak Says Saudi Arabia Carried Out 911, Not Bin Ladin" The article goes on to state under the heading "Senators Outraged Demand Answers" stating "according to numerous reports including the above linked article from The New York Post last week, the Saudi Arabian government was responsible for 911".  With regard to The New York Post article, there is a section in the article which states "as detailed by the New York Post this week, portions of some of the redacted pages have been leaked to the press.  What they show is undisputable proof that a certain country – not Iraq, Iran or Afghanistan as the Bush

administration has always insisted – was actually responsible for the attacks.  Those attacks killed over 2,000 Americans, launched U.S. led wars against no less than four Middle East nations and caused the U.S. taxpayers enough money to send every single American for three generations to college for free."   The article goes on further to state under the section "Eyes Open Report – Evidence Against the Saudi Dynasty" that "as the various news reports document regarding the leaking CIA mail, the 9/11 hijackers were receiving logistical and financial help in the weeks leading up to 9/11 from Saudi Arabian government officials and secret agents in American cities from "coast to coast".  The leaked CIA memo purportedly provides startling specific details documenting Saudi Arabia's responsibility for the September 11 Attacks.  **(The Whiteout Press Article is attached hereto and labeled Exhibit "3".)**

106.   An article in The Guardian dated May 13, 2016, headlined "Declassified Documents Detail 9/11 Commission's Inquiry into Saudi Arabia" states as follows:  "Earlier this week, a Republican Commissioner, former Navy Secretary, John F. Lehman, said there was clear evidence that Saudi government employees were part of a support network for the 9/11 hijackers- an allegation, Congressional officials have confirmed, that is addressed in detail in the 28 pages."  **(Guardian Article attached hereto and labeled Exhibit "4")**

107.   A most recent development in the United States election between Secretary of State Hillary Clinton and Donald J. Trump, a Clinton email leak may help preserve the power to sue Saudi Arabia for the September 11 Attacks.  A 2014 email released by Wiki Leaks in which Hillary Clinton asserted that the governments of Saudi Arabia and Qatar were directly aiding ISIS and other extremist groups may help stave off a Saudi lobbying effort aimed at reversing a newly enacted law giving 9/11 families the power to sue Saudi Arabia.

108.    The email sent to Clinton's presidential campaign chairman John Podesta lays out the assessment of the situation in Syria and Iraq and includes various policy prescriptions.

109.    One of them leveled a pointed indictment at Saudi Arabia.  "We need to use our diplomatic and more traditional intelligence assets to bring pressure on the government of Qatar and Saudi Arabia which are providing clandestine financial and logistical support to ISIL and other Sunni groups in the region."

110.    In an article in Forbes Magazine dated April 17, 2016, in an opinion article, entitled "Saudi Arabia's Threat to Sell Off $750 Billion Dollars of Assets Over 9/11 Bill" it states "even among governments, $750 billion is real money but this, but this, well I suppose we should call it a threat that Saudi Arabia would sell of $750 bill of U.S. assets if a certain bill passes Congress isn't that much of a threat.  Yes indeed it is a large amount of money but large in relation to what?  This is wealth assets so we can't go comparing it even to GDP which is a flow we need to compare it to the stock of assets in the United States and if that it is perhaps 1% of the assets of the nation.  Someone selling 1% of the stock of a company would be one of those things.  We would notice that but it would not be an existential crisis would it?"  However, the Saudis' have made a threat to sell off $750 billion of assets if the 9/11 bill is passed giving people like the Plaintiffs the ability to sue the Saudi Arabian government as a result of the damages they suffered from the September 11 Attacks.  Of course, that bill did pass and accordingly, Plaintiffs have to take the Saudi threat as a reality.

111.    An article in USA Today dated May 17, 2016, stated that "The US Treasury has finally revealed Saudi Arabia's holding of US debt – after four decades of keeping a secret and it's big.

112.     The oil rich nation is holding $1.9 billion in US Treasuries as of March 2016 the Treasury Department disclosed this week.  That ended its long standing practice of grouping the amount with other nations ever since Treasury began providing records on foreign ownership in 1974, Saudi Arabia's holdings weren't broken out separately but grouped in with more than a dozen nations, many of them members of OPEC.

## EFFECTS OF THE LOSS OF EMERIC J. HARVEY ON PLAINTIFFS

### JENNIFER CASTELANO (herein referred to as "Jennifer")

113.     On September 11, 2001, Jen was 30 years old, married for four years with no children.  Jennifer had grown up and had a normal childhood and had a loving relationship with her father, Emeric.  She was always close with him, he was easy to talk to, always responsive, caring, and very loving and involved in all the activities of his daughters.  Jennifer recalls that she and her sister, Antoinette took a trip to London with their father.  In all, the relationship between Jennifer and her father began to be excellent.  They both made a pact to move forward with their relationship.  Emeric was very affectionate with both of his daughters.  When Jennifer had a difficult time in high school, her father was always there for her to comfort her and give her words of encouragement.  He often told her that she and her sister, Antoinette "meant the world to him".

114.     Jennifer worked very hard to get into college and was accepted to the University of Tampa.  Jennifer told her father of her acceptance and he was elated and then took care of everything concerning college, including all of her expenses thereafter.  Her father came to visit her at the University of Tampa early in her first semester and often wrote her notes of affection and encouragement on the back of buy/sell tickets.

115.     Jennifer and her father were extremely close.  Jennifer depended on her father for advice, encouragement, and for help of any kind and he always came through.  Jennifer talked to her father about everything, about her infertility problem, about her finances, about her marital issues, about her dream of owning her own business.  Her husband and her father were best friends.  They were golf and racquetball buddies.

116.     On September 11, 2001, Jennifer was aware that her father was having a business breakfast at the restaurant on the top floor of the World Trade Center.  When the buildings fell, Jennifer became inconsolable because she was aware that her father was dead.  Jennifer required the help of a psychiatrist to help her live during the tragic aftermath of the barbaric death of her father.

117.     When Jennifer hears an airplane flying low, she becomes terrified because it brings back horrific memories and horrifying thoughts about the terror that her father was subjected to as a result of the September 11 Attacks and Saudi Arabia's participation in same.

118.     Jennifer's father, Emeric often told Jen that "family time was the most important time to him".  Jennifer's father was in the business of intentionally making memories for his two daughters.

119.     Jennifer says that the loss of her father's love, companionship, encouragement, dreams for her and wisdom is in an incalculable loss to Jennifer.  This loss continues for Jennifer for the rest of her life.

120.     Jennifer knows that her father would want her to take action against the parties responsible for his death.

**ANTOINETTE MCCARTHY (herein referred to as "Antoinette")**

121.    Antoinette was 28 years old of age on September 11, 2001.  Her relationship with her father, Emeric was always excellent.  She states that she and her father had similar personalities.  They both were "extremely loyal", "motivated", "everything was black and white", "honest with no sugar coating" and "independent".  Antoinette describes her father as totally honest.  He had season's tickets to all the sporting events in the metropolitan New York and New Jersey areas and he brought his daughters to many sports events.  One night he was able through his contacts to keep Macy's open late so that his daughters could shop alone. describes as "raw and honest in his conversations" and always thought of "fun activities" for his daughters.  She recalls falling asleep on her father's lap and feeling loved and safe.  Emeric was "never not a father" to his daughters.  He made sure that he knew his daughters' teachers, friends, and friends' parents.  During the years 1995-1996, and 1998, Emeric took his daughters' friends to help with learning about the stock trading business. Indeed, he assisted two of Antoinette's friends in obtaining jobs on the trading floor of the American Stock Exchange. Emeric frequently told Antoinette  "don't sell yourself short", "never give up hope", "don't take anything for granted", "always put yourself first, be true to who you are" and his very important and frequent statement that "live every day as if it were your last".

122.    Antoinette stated: "The sadness and pain in my heart from all of the loss was unbearable.  It took a toll on me physically as well as emotionally.  The muscles in my face began to contract.  I began clenching my teeth so tightly that I started to grind.  I developed chronic pain in my jaw.  I went to a maxillofacial pain doctor who prescribed me Valium, Clonazepam and Diazepam." All these prescribed medications did not relieve Antoinette of her pain, both mental and physical. The pain was too great.

123.    Antoinette further states: "I underwent a number of root canals.  I developed a permanent click in my jaw.  It is a constant physical reminder of 9/11 that will never go away.  I guess my point is that I know that everyone gets old eventually but I got old in the blink of an eye at the age of 28".

124.    Antoinette started working for her father during the summers in high school from 1988-1991.  After high school, she went straight down to the trading floor of the New York Stock Exchange full-time.  By the time her father hired her in June 2001, Antoinette was already a head clerk for Robertson Stephens & Co.  Antoinette was the eightieth woman in history to sign the Broker's Book when she became a broker.  Antoinette was introduced to her husband, Michael McCarthy, by her father when he hired Michael in October 1993.  They were married on May 8, 1999.  Antoinette worked for HYY on September 11, 2001.

125.    Antoinette states that her father respected her for the person she was.  She would go to him instead of her mother for advice.  Antoinette, too, since September 11, 2001, is plagued by nightmares, and dreams about how her father died and the vacuum that is missing in her life because of her father's death.  She talks about his affection, his honesty, his belief in her, his view of life, and the great effect that her father would have on her life if he were alive today.  She too states that his loss to her is incalculable and that loss will be deeply felt by her for the rest of her life.

## September 11, 2001 and the Day Before

126.    Antoinette worked for her father at his company Harvey Young Yurman, Inc.  Her father was in the habit of holding a business breakfast every Tuesday morning at the Windows of the World, which was the restaurant on the top floor of the World Trade Center.  On September 10, 2001, at 3:30 p.m., Antoinette informed her father she was going to miss the

breakfast meeting at the Windows of the World  the next day because of a cracked tooth and had to get her tooth fixed that afternoon, September 10, and would be unable to be at the breakfast because of her tooth problem.  Antoinette did state that when she was present at meetings, the meeting would end at 8:35 a.m. and she and her father would immediately leave.  Antoinette is plagued by the fact that had she been at the meeting perhaps she and her father would have left early as they often did and he would still be alive today.  She is also plagued by the thoughts, nightmare and dreams of the last moments of her father's life at the top of the World Trade Center when the hijacked planes hit the towers.

127.    Antoinette entered the New York Stock Exchange at 8:43 a.m. on September 11, 2001.  She saw the situation of the planes hitting the towers on the screens and immediately buzzed the brokers who she knew were with her father at the 7 a.m. breakfast.  One of the individuals called back and said they were told to sit and wait until the firefighters would come.  Antoinette states that she knew when the tower collapsed that her father was dead.  She received official word that Friday night, September 14, 2001.

128.    Thereafter, Antoinette assumed the role of President of Harvey Young Yurman, Inc. and worked closely with Dick Grasso and other NYSE trading floor officials to prepare for the stock market to open on Monday, September 17, 2001.  She described herself as being on "auto pilot", "mentally exhausted", "emotionally drained", "mind has shrunk", and "couldn't sleep"..

129.    What she wanted to do most was to make her father proud of her at this tragic moment.  At a memorial for her father at St. Patrick's Cathedral, where all the people that worked for her father's company were in attendance, Antoinette did the eulogy.  In her eulogy she stated

"It stole from us a man who to me was everything.  This person is my father, Emeric J. Harvey.  My dad was the center of my universe as well as my sister's, and his wife's.  He gave us strength, confidence and so much love and we are so thankful for the opportunity to have loved him back.

When we were together it was alwayas an adventure.  The Tuesday before this tragedy we were eating 4 pound lobsters while singing with a Mariachi band for my birthday, and Tuesday before that, we were 4,000 feet in a hot air balloon above Utah.  That was my father all the time.  He lived each day to the fullest.  He loved us so much and were a part of everything he did."

## COUNT I
## SAUDI ARABIA'S LIABILITY PURSUANT TO THE JUSTICE AGAINST TERRORISM ACT ("JASTA")

130.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs and further allege by information and belief that Osama bin Laden and al-Qaeda have admitted responsibility for the September 11 Attacks.

131.    JASTA was passed by the Congress of the United States overriding the veto by President Barack Obama.

132.    Section 2(7) of JASTA under the heading of "Findings and Purpose" states:

> The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities or countries that have knowingly and recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

133.    Plaintiffs are persons who were injured as a result of the death of their father, Emeric J. Harvey as a result of the actions of al-Qaeda and Osama bin Laden which were the organization and person responsible for their injuries.

134.    Plaintiffs' injuries were proximately caused by the above actions of Saudi Arabia.

WHEREFORE, Plaintiffs demand judgment in their favor against the Defendant, Saudi Arabia in an amount in excess of $20 million, together with treble damages, punitive damages,

pre and post judgment interest, attorney's fees, costs of this action, and such other equitable relief as this Court deems appropriate to prevent Defendant, Saudi Arabia from ever again committing such terrorist acts.

## COUNT II
## SAUDI ARABIA'S LIABILITY FOR DELIVERING AND DISCHARGING A LETHAL DEVICE INTO A PLACE FOR PUBLIC USE IN VIOLATION OF 18 U.S.C. 2332(F)

135.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs and further allege by information and belief that Osama bin Laden and al-Qaeda have admitted responsibility for the September 11 Attacks.

136.    Plaintiffs are nationals and citizens of the United States who are heirs and survivors of Emeric J. Harvey, their father, who was murdered as a result of international terrorism, finance plan and perpetrated by al-Qaeda with the material support and assistance of the Kingdom of Saudi Arabia.

137.    Defendant, Saudi Arabia's material support for al-Qaeda, international terrorism and the September 11 Attacks on the Twin Towers violated 18 U.S.C. 2332(f) when it unlawfully caused multiple jet aircraft to intentionally crash into the Twin Towers (a place of public use) at high speed.  The resulting explosion, fire and structural damage caused the Twin Towers to collapse causing the death of Plaintiffs' father, Emeric J. Harvey.

138.    The September 11 Attacks on the Twin Towers were formed with the intent to cause serious bodily injury and death.

139.    The September 11 Attacks took place entirely within the United States and in the Borough of Manhattan, City of New York and were committed against a place of public use, namely the World Trade Center.

140.    A perpetrator of the September 11 Attacks, namely Osama bin Laden was subsequently killed.

141.    The perpetrators of the September 11 Attacks were nationals of another state, namely Saudi Arabia.

142.    As a result of the September 11 Attacks, Plaintiffs have suffered severe damages as a result of the death of their beloved father, Emeric J. Harvey.

WHEREFORE, Plaintiffs demand judgment in their favor against the Defendant, Saudi Arabia in an amount in excess of $20 million, together with treble damages, punitive damages, pre and post judgment interest, attorney's fees, costs of this action, and such other equitable relief as this Court deems appropriate to prevent Defendant, Saudi Arabia from ever again committing such terrorist acts.

## COUNT III
## SECTION 18 U.S.C. 2333 – TREBLE DAMAGES FOR U.S. NATIONALS

143.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs and further allege by information and belief that Osama bin Laden and al-Qaeda have admitted responsibility for the September 11 Attacks.

144.    As set forth above, Defendant, Saudi Arabia proximately caused the deaths and injuries of Emeric J. Harvey through and by reason of its support, both directly and indirectly, of the acts of international terrorism by al-Qaeda and Osama bin Laden.

145.    As set forth above, Defendant, Saudi Arabia provided material support and assistance to Osama bin Laden and al-Qaeda and the 9/11 terrorists for which they carried out terrorist attacks on the United States including September 11, 2001 terrorist attacks.

146.    As a result of Defendant, Saudi Arabia's acts and furtherance of international terrorism, Plaintiffs have suffered damages as set forth herein.

41

147.    Pursuant to Section 18. U.S.C. 2333 *et. seq.*, the children of Emeric J. Harvey who are nationals of the United States are entitled to recover three fold of damages they have sustained and the cost of suit including attorney's fees.

WHEREFORE, Plaintiffs demand judgment in their favor against the Defendant, Saudi Arabia in an amount in excess of $20 million, together with treble damages, punitive damages, pre and post judgment interest, attorney's fees, costs of this action, and such other equitable relief as this Court deems appropriate to prevent Defendant, Saudi Arabia from ever again committing such terrorist acts.

**COUNT IV**
**PUNITIVE DAMAGES**

148.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs and further allege by information and belief that Osama bin Laden and al-Qaeda have admitted responsibility for the September 11 Attacks.

149.    The foreign state defendant, Saudi Arabia and its agencies and instrumentalities, directly or indirectly, caused, contributed to, supported, conspired to, conspired to cause, aided and abetted the commission of the terrorist attacks that resulted in the death and injuries as §described above.

150.    The actions of the agencies and instrumentalities of the foreign state defendant, acting individually and/or in concert to carry out their unlawful objectives, were malicious, outrageous and in willful, wanton and reckless disregard for the rights of the Plaintiffs.  These agencies and instrumentalities acting individually and jointly specifically intended to engage in or otherwise sponsor terrorism.

151.    Pursuant to 28 U.S.C. § 1606, which specifically authorizes a claim for punitive damages arising from state sponsored terrorist acts actionable under 28 U.S.C. § 1605(a), and for

42

the reasons stated herein, Plaintiffs seek punitive damages from Saudi Arabia for the reason herein stated.

WHEREFORE, Plaintiffs demand judgment in their favor against the Defendant, Saudi Arabia in an amount in excess of $20 million, together with treble damages, punitive damages, pre and post judgment interest, attorney's fees, costs of this action, and such other equitable relief as this Court deems appropriate to prevent Defendant, Saudi Arabia from ever again committing such terrorist acts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor and against Defendant, Saudi Arabia in an amount of at least $20 million and grant the Plaintiffs:

a.   Compensatory and punitive damages in favor of Plaintiffs against Defendant.

b.  Treble damages.

c.  Attorney's fees.

d.  Pre-judgment and post-judgment interest or other appropriate interest.

e.  Costs and expenses.

f.  Punitive damages

and such other and further relief as this Honorable Court may determine to be just and appropriate under the circumstances.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

                        Respectfully submitted,

                        SHENDELL & POLLOCK, P.L.

By: _s/Allan C. Samuels_____
        Allan C. Samuels, Esq.
        Bar No.: AS1439
        Shendell & Pollock, P.L.
        2700 N. Military Trial
        Suite 150
        Boca Raton, FL 33431
        561-241-2323
        561-241-2330 (fax)

w:\files\castellano v. saudi arabia\pleadings\plead - complaint.docx